UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
FORT WAYNE DIVISION

| | |
|---|---|
| KRYSTAL THAYER | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| v. | ) CASE NO.1:20 CV 0107 HAB-SLC |
| | ) |
| LINCOLN FINANCIAL GROUP, | ) |
| | ) |
|     Defendant. | ) |
| | ) |

**OPINION AND ORDER**

Plaintiff, Krystal Thayer ("Thayer") demanded Defendant Lincoln National Life Insurance Company[1] ("LNL") reassign her to a new position to accommodate her disabilities. When no vacant positions that fit Thayer's restrictions became available, LNL sought to accommodate her disabilities by other workplace modifications – all to the dissatisfaction of Thayer. Having exhausted its options with Thayer and her continuing refusal to return to work, LNL deemed her to have resigned. Thayer sued under the Americans with Disabilities Act ("ADA") asserting that LNL failed to engage in the interactive process, failed to provide reasonable accommodations, and retaliated against her by terminating her employment.

Before the Court is LNL's Motion for Summary Judgment (ECF No. 15). The parties have fully briefed the motion (ECF Nos. 16, 21-23) and the matter is ripe for determination. Because Thayer did not sue her employer, and even if she did, her claim for failure to accommodate is insufficient in a multitude of ways to withstand summary judgment, LNL's motion will be

---

[1] LNL has repeatedly conveyed in its filings that it was wrongly identified as Lincoln Financial Group in the Complaint, but Plaintiff has not amended the complaint to correct the error and sue Plaintiff's actual employer. More on this issue to come.

GRANTED on that claim. So too, she has no evidence of retaliation from which a jury could conclude LNL terminated her employment because of her disabilities.

### I. Factual Background

LNL is in the business of developing and selling life insurance and annuities. (Jester Decl. ¶3, ECF No. 16-3). Thayer was hired in August 2015 in a Review Processor and Internal Support position. (Thayer Dep. at 19, ECF No. 16-1). In February 2017, she was promoted to the position of Senior Financial Processor. (*Id.* at 25 and Ex. 3 to it). Thayer described her job as "physically processing work items" which required her "[b]eing on a computer and repetitive hand motion, constant keyboard contact." (*Id.*). While in that position Thayer first reported to Beth Whitaker and, at the time of these events, Cory Gabriel (Gabriel).

Thayer has been diagnosed with a host of medical issues, including: bulging discs; bone spurs; arthritis in her neck; impingement syndrome in her left arm; and bicep tendonitis and lesions on her left shoulder. (Thayer Dep. at 32-33). In March 2018, Thayer began experiencing pain and swelling in her hands, arms, and neck. (*Id.* at 35). On April 18, 2018, Thayer submitted a doctor's note from her family physician Dr. Thomas Kintanar (Dr. Kintanar) to Gabriel. In that note, Dr. Kintanar wrote: "Thayer was in an auto accident, 8/2012, which she sustained upper extremity injuries. She continues to have pain in this area. She would benefit from a stand-up desk while working." (*Id*. at 36-37 and Dep. Ex. 4). Within two weeks of this request, LNL provided Thayer a stand-up desk. (*Id.* at 39-40).

In July 2018, Thayer began physical therapy three times a week. Emails between Thayer and Gabriel show that LNL accommodated Thayer's physical therapy and other medical appointments. (Thayer Dep. at 43-46 and Dep. Ex. 6). Upon the recommendation of Dr. Kintanar, Thayer requested and was approved for a medical leave of absence to allow her time to heal, complete physical therapy, and receive other treatment. She was on FMLA leave from August 7,

2018, to October 29, 2018. While on FMLA leave, Thayer applied for short-term disability benefits, but was denied. Her appeal of that decision was also denied.

On the final day of her FMLA leave, Thayer called Stacy Jester (Jester), Employee Relations Consultant, and advised that Dr. Kintanar had permanently disabled her from her Senior Processor position because of "the constant data entry keystroke repetitiveness on the keyboard, along with being stationary for so many hours during the day." (Thayer Dep. at 53-55; Jester Decl. ¶6). On October 30, 2018, Jester emailed Thayer an accommodation leave form for Thayer to complete. Section 8 of the form asked: "What functions of your role or working conditions are impacted by the disability and how?" Thayer returned the form the next day and responded to the above question, writing: "Standing or sitting and being on keyboard 8 hours a day. Being in a stationary position exasperates [sic] my condition. I also have restrictions on lifting anything over 10 pounds." (Thayer Dep. at 56-57 and Ex. 10). The next section asks Thayer for "requested or suggested accommodation" that would enable her to perform the essential functions of her position. Thayer responded, "I need to be up and moving more freely and not be in a production role. Leadership role, trainer, or mail support role." (*Id.* at 57-58, Ex. 10).

In early November 2018, Thayer advised Jester by email that she could search for internal LNL positions on her home computer and applied for two management positions.[2] The next day, Jester requested and sent Thayer forms for her physician to complete about her medical condition. A few days later, Thayer returned a medical form completed by Dr. Kintanar. Dr. Kintanar wrote that Thayer's "pain and discomfort caused by [her] current condition precludes continuing in current position" and she is unable "to maintain a stationary position [with] arms ergonomically lifted with computer work for a long period of time." (Thayer Dep. at 70-74, Ex. 11). No suggested

---

[2] In December 2018, Jester asked about the management positions to which Thayer applied. Thayer told Jester she had received denial letters for these positions. (Jester Decl. ¶ 7).

3

accommodations were in the physician statement, but he noted that "physical therapy has recommended a change away from current position." (*Id.* at 76-77). Thayer's limitations were described more in a "physical capabilities form" that reflected Thayer: (1) could sit 2 to 4 hours a day; (2) required breaks to stand/walk/stretch every 0 to 2 hours; (3) could occasionally lift up to 15 pounds; and (4) could use her hands for repetitive grasping, pushing and pulling, and fine manipulation. (*Id.* at 78-80, Ex. 11).

On January 4, 2019, Jester sent Thayer a letter relating to her accommodation request. Based on the physical restrictions listed by Dr. Kintanar, LNL did not believe Thayer was restricted from performing the essential functions of the Senior Financial Processor role. Jester offered Thayer, besides the provided stand-up desk, another 15-minute break during the workday. (Jester Decl. ¶ 10). With this added accommodation, Jester asked Thayer to report to work on January 14, 2019. She did not. Instead, Thayer emailed Jester new documentation from Ashley Bidlack CMA:

> To Whom it May Concern,
>
> Please excuse Krystal from returning to work on 01/14/2019. Krystal will not be released to preform her current role. As you are aware that she was perminately disabled from her current role on 10/29/2018. Again, the reasonable accomodation for her disability is a new (non-processor) role.
>
> Electronically signed by: Ashley Bidlack CMA  Jan 10 2019 12:23PM UEST Author

(Thayer Dep. Ex. 13). A second note, written by Dr. Kintanar and dated September 28, 2018, was also provided to Jester. This note, written as part of Thayer's previously denied claim for short-term disability, stated:

4

> 9/28/2018
>
> Letter of Appeal
>
> Short Term Disability
>
> Krystal Thayer is a patient of Dr Thomas Kintanar. Dr Kintanar has been treating Krystal for the past few months for injury she has acquired at her job. Krystal has sustained injury to her hands due to repetitive typing motion and use of a keyboard and mouse for 8-10 hours a day. Constant sitting has also injured her neck as she is required to use a computer for the length of her work day. She has been off work for several months due to these injuries. She has attended physical therapy at Dr Kintanar's recommendation. Physical therapy has also recommened that Krystal be off work to rest and heal from her injuries. Please consider this information with regard to her Short Term Diability. It is medically necessary for Krystal to be off work to heal from her injuries. Thank you.
>
> Dr Thomas Kintanar

After receiving this information, Jester sent Thayer another letter explaining that although Thayer had mentioned being unable to do repetitive hand motions, the accommodation form submitted by Dr. Kintanar in November 2018 did not show she had this physical limitation. Jester also explained that she lacked access to any records submitted in support of Thayer's short term disability claim and the only evidence of Thayer's restrictions was the accommodation form. But because of the new information Jester received, she offered Thayer a third accommodation of using voice activated software that would enable her to perform nearly all the Senior Financial Processor duties without the use of a keyboard or mouse. LNL had used this software to accommodate employees with similar restrictions to Thayer. Jester requested Thayer to return to work on January 28, 2019.

That did not happen. On January 23, 2019, Thayer emailed Jester and reiterated that her doctor's reasonable accommodation was a "non-processor role" and that she "can't do a processor role." Yet she agreed to return to work with the extra 15-minute break and the new voice activated software. Thayer requested a "ramp up" period to re-learn her job and posed some questions to Jester about her return to work. Jester responded to all of Thayer's questions on January 24, 2019, as follows: (1) Thayer would receive a ramp up period; (2) she would receive formal training on the voice activated software; (3) a release to work would be required from Thayer's doctor or an

5

explanation why a release to work is not authorized along with specific concerns with the voice activated software; (4) an 8-hour work day (no overtime) is part of her accommodation; and (5) Thayer's production standards would be determined after the ramp up period and training on the voice activated software.

In reply, Thayer asked for the make and model of the voice activated software so she could review it with her doctor. Jester provided a link to the voice activated software and YouTube videos featuring the software. On February 6, 2019, Thayer emailed Jester telling her that her doctor would not release her to her current role. Jester responded the same day explaining that she needed Dr. Kintanar "to explain why the accommodation will not work for your medical condition." (Thayer Dep. at 135, Ex. 17; Jester Decl. ¶16).

On February 13, 2019, Thayer provided this note from Dr. Kintanar, along with the medical certification form:

> Dear Ms. Jester,
>
> I have been asked by Ms Thayer to correspond to two specific questions regarding her current employment status. The first question is in regards to her use of voice recognition software. Certainly on the surface it would seem that this would be a satisfactory exchange for the avoidance of working at a keyboard and utilizing a mouse. At this time I am using very similar software and understand the concept. However in using the software, there are times and in certain instances, more often times than not where I have to correct the mistakes that have been picked up by the voice recognition software. This obviously requires the utilization of manual technique. This may in turn aggravate the primary anomaly.
>
> The second question is in regards to the extra break time. It's quite obvious that there will have to be some type of keyboard work. This will aggravate the primary symptom complex. The extra Breaktime may afford her an opportunity to minimize or even alleviate the primary symptom complex which has resulted in her disability.
>
> If there are any further questions please (today it's no if there are any further questions, please to hertz night) ( The previous statement is an example of erroneous voice recognition error)
>
> To re-state, if there are any further questions regarding Ms. Thayer's situation please do not hesitate to contact or call me.

6

(Thayer Dep. Ex. 17). Question 7 of the accompanying medical certification form asked Dr. Kintanar: "What, if any, medically necessary reasonable accommodations do you recommend that could assist the employee in performing the essential function of his/her position?" Dr. Kintanar responded, "none. [Patient] in physical therapy, change away from current position and use of computer and mouse." (*Id*). Dr. Kintanar also stated the accommodation was "permanent." (*Id.*) He limited Thayer to sitting two to four hours per day and working eight hours per day and recommended a break every two hours. He confirmed he would release Thayer "when a different position meeting her needs is available." (*Id.*).

On February 20, 2019, Jester sent Thayer this communication:

> Dear Krystal,
>
> Thank you for providing the documentation from your doctor. At this time, we are moving forward with the expectation that you will return to work with the accommodation as proposed: the voice activation system as well as the ability to take up to 3 breaks and a lunch each day. We understand the concern raised by your physician that the voice activation system may result in dictation errors. However, I have personally used this system and am familiar with the fact that potential errors can arise based on someone's articulation, volume, rapidity of speech and other factors. We believe that before you outright reject the offered accommodation we need to explore how the system works for you.
>
> Your position remains open for your return and we have set your new return to work date as February 25, 2018. We look forward to your return.
>
> Thank you,
> Stacy Jester

(Thayer Dep. Ex. 18).

Thayer, unhappy with this correspondence from Jester and the expectation she return to work in her Senior Financial Processor position with the discussed accommodations, responded with a two-page letter that can fairly be classified as argumentative. At the end of the letter, Thayer writes, "I will expect a 'reasonable accommodation' which should have been 'reassignment' as ordered by my doctor continually and that should have happened many months ago!" (Thayer Dep. Ex. 19). Thayer did not return to work.

7

On March 8, 2019, Jester sent a final letter to Thayer addressing her failure to return to work. Thayer had applied for ten open positions she believed she could perform, including management-level positions and customer service positions. But in this letter Jester documented Thayer's refusal to try the offered accommodation and told Thayer that every position she had applied for required the use of a keyboard and mouse as an essential job function. Jester communicated LNL's position that Thayer was not participating in the interactive process in good faith and concluded the letter by considering Thayer to have resigned her employment with LNL.

Based on these facts, Thayer filed suit asserting LNL failed to reasonably accommodate her disabilities and retaliated against her, both in violation of the ADA.

## II.      Legal Analysis

### A.      *Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the initial responsibility of informing the district court of the basis of its motion and identifying those portions of designated evidence that show the lack of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). After "a properly supported motion for summary judgment is made, the adverse party must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986) (quotation marks and citation omitted).

A factual issue is material only if resolving the factual issue might change the outcome of the case under the governing law. *See Clifton v. Schafer*, 969 F.2d 278, 281 (7th Cir. 1992). A factual issue is genuine only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party on the evidence presented. *See Anderson*, 477 U.S. at 248. In deciding a motion for summary judgment, the court "may not 'assess the credibility of witnesses, choose

8

between competing reasonable inferences, or balance the relative weight of conflicting evidence.'" *Bassett v. I.C. Sys., Inc.*, 715 F. Supp. 2d 803, 808 (N.D. Ill. 2010) (quoting *Stokes v. Bd. of Educ. of the City of Chi.*, 599 F.3d 617, 619 (7th Cir. 2010)). Instead, it must view all the evidence in the light most favorable to the non-moving party and resolve all factual disputes in favor of the non-moving party. *See Anderson*, 477 U.S. at 255.

### B.  *Plaintiff has not Sued her Employer*

Before reaching the merits of Plaintiff's claims, the Court must first address the entity Plaintiff has sued. As it has since its Notice of Removal, LNL pointed out in its summary judgment brief (and again in its reply) that it, not the named Defendant, was Plaintiff's employer. (See ECF No. 1: "'Lincoln National' incorrectly identified as Lincoln Financial Group…"; ECF No. 23 at 3: "[Thayer] was never employed by 'Lincoln Financial Group'…") Although this issue has been front and center since the first filing in this removed case, Plaintiff only addressed it after receiving a summary judgment opinion and order from this Court in a similar case against this same Defendant.[3] Plaintiff has now moved to amend the Complaint (ECF No. 24) to sue the proper Defendant. Defendant objects to the belatedness of the filing and argues that Plaintiff fails to show good cause in failing to amend earlier. (ECF No. 25).

No doubt Plaintiff's neglect in failing to address the issue is not excusable nor has she provided good cause for not amending earlier after being repeatedly told that she had sued the wrong defendant. Plaintiff decided to continue suit against a non-liable entity all the way through

---

[3] The Court takes judicial notice of another case filed by Plaintiff's counsel, 1:20-CV-284, captioned *Tamara Thayer v. Lincoln Financial Group*, wherein the same issue arose. There, the Plaintiff, in her summary judgment response, agreed that she had sued the wrong employer. She stated, "[a]s a matter of housekeeping, the correct Defendant is 'The Lincoln National Life Insurance Company' – as set forth in the introductory paragraph of Defendant's Answer. Thayer requests that the Court reflect the proper name of the Defendant by way of interlineation." (ECF No. 23 at 1). The Court denied this request and found summary judgment appropriate. (*See* Opinion and Order on Summary Judgment, ECF No. 26 at 7–8).

9

the summary judgment filings. Plaintiff fails to explain why this issue was never addressed except to say that "it used to be" that the Court would correct the error on Plaintiff's behalf through interlineation.

This Court has said it before and will repeat the concept here. Suing your employer in an employment discrimination case is not a mere housekeeping matter. The ADA prohibits discrimination and retaliation by employers. *See* 42 U.S.C. § 12111; *Povey v. City of Jeffersonville, Ind.*, 697 F.3d 619, 624 (7th Cir. 2012); *Christner v. American Eagle Airlines, Inc.*, 2003 WL 21267105, at *3 (N.D. Ill. May 30, 2003). Part and parcel to such claims, then, is naming one's employer as the defendant. When an employee fails to name her employer, the appropriate consequence is the entry of summary judgment for the non-employer entity. *Pitts v. Elkhart Cnty.*, 2007 WL 3256663 (N.D. Ind. Nov. 2, 2007).

This Court has been clear that a plaintiff that proceeds to summary judgment against a non-liable entity does so at her own peril. *See Padgett v. Norfolk S. R.R.*, 2021 WL 2434293 (N.D. Ind. June 15, 2021). Plaintiff ignored repeated warnings from Defendant that it was not her employer. Having failed to amend her complaint in a timely fashion and to show any good cause or excusable neglect for failing to do so, the Court is left with only one option. Defendant is entitled to summary judgment as a matter of law. The Motion to Amend (ECF No. 24) is DENIED.

  **C.**  *Plaintiff is not a Qualified Individual Under the ADA*

Even had the Court permitted Plaintiff to amend her complaint to name the proper employer over a year and a half after the deadline to do so had run, summary judgment would still be entered. The ADA prohibits an employer from discriminating "against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). "The ADA then defines 'discriminate against a qualified

individual on the basis of disability' to include disparate treatment and failure to accommodate: 'not making reasonable accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability who is an applicant or employee.'" *Scheidler v. Indiana*, 914 F.3d 535, 541 (7th Cir. 2019) (emphasis omitted) (quoting 42 U.S.C. § 12112(b)(5)(A)). Plaintiff's complaint focuses on LNL's alleged failure to accommodate. (ECF No. 5 at 3).

"No matter the type of discrimination alleged—either disparate treatment or failure to provide a reasonable accommodation—a plaintiff must establish first that she was 'a qualified individual with a disability.'" *Sieberns v. Wal-Mart Stores, Inc.*, 125 F.3d 1019, 1022 (7th Cir. 1997). Under the ADA, a "qualified individual with a disability" is "an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The employee must "pass a two-step test" to be a "qualified individual." *Weiler v. Household Fin. Corp.*, 101 F.3d 519, 524 (7th Cir. 1996). "First, the individual must satisfy 'the prerequisites for the position, such as possessing the appropriate educational background, employment experience, skills, licenses, etc.'" *Id*. "Second, the individual must be able to 'perform the essential functions of the position held or desired, with or without reasonable accommodation.'" *Id*. "[Courts] presume that an employer's understanding of the essential functions of the job is correct, unless the plaintiff offers sufficient evidence to the contrary." *Gratzl v. Office of Chief Judges of 12th, 18th, 19th, & 22nd Judicial Circuits*, 601 F.3d 674, 679 (7th Cir. 2010) (*citing Basith v. Cook Cnty.*, 241 F.3d 919, 927 (7th Cir. 2001)); *see also Feldman v. Olin Corp.*, 692 F.3d 748, 755 (7th Cir. 2012) (courts must "generally defer to an employer's determination of the essential functions of a job"); *Lloyd v. Swifty Transp. Inc.*, 552 F.3d 594, 601 (7th Cir. 2009) ("The employer, not a court, determines

11

what functions are essential, and we will not second-guess that decision."). Ultimately, "[t]he burden of proof on the issue of capability is not on the employer but on the plaintiff." *Miller v. Ill. Dep't of Corrs.*, 107 F.3d 484, 484 (7th Cir. 1997).

In determining whether Plaintiff was a qualified individual, the Court must look to the position she held at the time of the adverse employment decision. *Hamm v. Exxon Oil Corp.*, 223 Fed. Appx. 506, 508 (7th Cir. 2007). Thus, Plaintiff must show that she could perform the position of Senior Financial Processor with or without reasonable accommodation. Plaintiff does not argue she could perform that position without accommodation. Thus, the question before the Court is whether Plaintiff could perform the position with a reasonable accommodation.

The parties dispute whether the voice-activated software offered by LNL was a reasonable accommodation. The burden is on Plaintiff to show that LNL did not offer a reasonable accommodation. *King v. City of Madison*, 550 F.3d 598, 600 (7th Cir. 2008); 42 U.S.C. § 12112(b)(5)(A). But an employer need not provide an employee the accommodation she requests or prefers, or even the most reasonable accommodation—the employer need only provide some reasonable accommodation. *Gile v. United Airlines*, 95 F.3d 492, 499 (7th Cir. 1996); *see also Jay v. Intermet Wagner, Inc.*, 233 F.3d 1014, 1017 (7th Cir. 2000). The ADA defines "reasonable accommodation" to include "job restructuring . . . reassignment to a vacant position, acquisition or modification of equipment or devices, appropriate adjustment or modifications of examinations, training materials or policies . . . and other similar accommodations." 42 U.S.C. § 12111(9).

When evaluating the reasonableness of an offered accommodation, the Court should be mindful that reasonableness is "connected to what the employer knows about the specific limitations affecting an employee." *Jackson v. City of Chicago*, 414 F.3d 806, 813 (7th Cir.2005); see also 42 U.S.C. § 12112(b)(5)(A) (defining "discriminate" to include "not making reasonable

12

accommodations to the known physical or mental limitations of an otherwise qualified individual with a disability"); *see also Beck v. Univ. of Wisconsin Bd. of Regents*, 75 F.3d 1130, 1135 (7th Cir.1996) ("By the statutory language, 'reasonable accommodation' is limited by the employer's knowledge of the disability.").

Plaintiff's entire case rests on Dr. Kintanar's opinion that she was "permanently disabled" from her position and the only reasonable accommodation that existed was a new position. She repeatedly told Jester, as did Dr. Kintanar, that she could not use a mouse and keyboard even with the voice activated software offered to her. In fact, when asked to certify which accommodations would enable Plaintiff to perform the essential functions of her current position, Dr. Kintanar responded "none.… change away from current position and use of computer and mouse." (Thayer Dep. Ex. 17). Thayer acknowledged in her affidavit that she could not perform her position even with reasonable accommodation:

> 6. My doctor, Thomas Kintanar, on October 29, 2018, permanently disabled me from my position based upon his exam, prior tests, and physical therapy notes – all of which I shared with LNL. I needed a non-processing position, because I was unable to maintain a stationary position with arms ergonomically lifted for computer work for long periods of time, and could not function at the current work situation due to physical limitations.

(Thayer Aff., ECF No. 22-2, at ¶6; see also ¶12: "I made clear that I was requesting a new position that I could do, since I could not perform the functions in my previous position."). Plaintiff's evidence can be read only one way: she could not perform the Senior Financial Processing position regardless of the proposed accommodation. Plaintiff's position dooms her ADA claim as she is not a "qualified individual" under the Act.

Plaintiff's argument seemingly ignores the above facts and focuses instead on what she believes should have been the appropriate accommodation – a different position. While the ADA does not obligate an employer to manufacture a new position for an otherwise qualified employee, it does require an employer to transfer employees to vacant positions for which they are otherwise qualified as a reasonable accommodation. *Jackson v. City of Chicago,* 414 F.3d 806, 813 (7th Cir.2003). "It is the plaintiff's burden to show that a vacant position exists for which [s]he was qualified." *Ozlowski v. Henderson,* 237 F.3d 837, 840 (7th Cir.2001).

Plaintiff has not met her burden. Thayer states she applied for ten open positions at LNL and was not placed in any of them. She contends that many of these positions were non-processing roles that would not require her to use a mouse or keyboard constantly. Yet the undisputed record is that none of the positions Thayer applied for would have met the restrictions set forth by Dr. Kintanar. Thayer tries to rewrite the record in her affidavit by saying that she "could still use a keyboard and mouse, just not constantly…" (Thayer Aff. ¶ 33). But this conflicts with Dr. Kintanar's restrictions that specified even occasional use of a mouse and keyboard would "aggravate the primary anomaly." Indeed, the very reason Dr. Kintanar refused to approve the voice-activated software was because of the likelihood that its use would require occasional "manual manipulation" by Thayer and force her to use a keyboard and mouse. In essence then, by limiting Thayer's use of a keyboard and mouse even occasionally, Dr. Kintanar disqualified her for all positions at LNL that required keyboard and mouse use. Defendant has submitted evidence that there were no positions available that did not require the use of a keyboard and mouse, and Plaintiff has submitted nothing to dispute this fact. Dr. Kintanar effectively restricted Plaintiff from any employment at LNL, leaving transfer to a new position unavailable.

In sum, Thayer has not, and cannot, raise a triable issue of fact over her status as a qualified individual covered by the ADA — a requirement to proceed with her claims of failure to accommodate. For this reason, the Court need not reach the merits of her failure to accommodate claims. *Arroyo v. Volvo Grp. N. Am., LLC*, 2019 WL 4749869, at *13 (N.D. Ill. Sept. 30, 2019); *Moore-Fotso v. Bd. of Educ. of the City of Chicago*, 211 F. Supp. 3d 1012, 1028 (N.D. Ill. 2016) ("Because Plaintiff fails to establish that she is a qualified individual within the meaning of the ADA, the Court need not address the merits of her failure to accommodate claim."). Defendant's motion for summary judgment must be granted on the ADA failure to accommodate claim.

### D. *Plaintiff is Responsible for the Breakdown in the Interactive Process*

The Plaintiff's claim also fails based on her failure to engage in the interactive process. Once made aware of the need for accommodation, "an employer cannot shield itself from liability by choosing not to follow up on an employee's requests for assistance." *EEOC v. Sears, Roebuck & Co.*, 417 F.3d 789, 804 (7th Cir. 2005). Rather, the employer has an "affirmative obligation to seek the employee out and work with her to craft a reasonable accommodation." *Mlsna v. Union Pac. R.R. Co.*, 975 F.3d 629, 638 (7th Cir. 2020) (quoting *Sears*, 417 F.3d at 807). Moving forward, "the employer and the employee must work together through an 'interactive process' to determine the extent of the disability and what accommodations are appropriate and available." *Sears*, 417 F.3d at 804. Each party must set forth a "'good faith effort' to determine what accommodations are necessary." *Lawler v. Peoria Sch. Dist. No. 150*, 837 F.3d 779, 786 (7th Cir. 2016) (quoting *Beck*, 75 F.3d at 1135). If the process breaks down, "courts should attempt to isolate the cause...and then assign responsibility." *Id*.

In this case, LNL offered the Plaintiff an accommodation to the restriction regarding the use of the keyboard and mouse. In response to the offered accommodation, the Plaintiff refused to

even try the voice activated software, repeatedly asserting that the only accommodation she would accept would be transfer to a non-processing position. Plaintiff's conduct cannot be described as a good faith effort to determine what accommodations are necessary.

When a plaintiff is the cause of a breakdown in the interactive process, she cannot prevail on her ADA claim. *Beck*, 75 F.3d at 1137. So it is here. Plaintiff's uncompromising approach to the accommodations offered by LNL stunted the interactive process before it got off the ground. Plaintiff's failure to participate in the interactive process is yet another reason why summary judgment is appropriate.

E. *Plaintiff has not Designated Evidence of ADA Retaliation*

Separate from her ADA failure to accommodate claim, Plaintiff also claims that Defendant retaliated against her for requesting the accommodations. The ADA prohibits retaliating against individuals (qualified or not) who have engaged in activities protected by the ADA, such as filing a Charge of Discrimination with the EEOC or requesting reasonable accommodations. *Rodrigo v. Carle Found. Hosp.*, 879 F.3d 236, 243 (7th Cir. 2018). To establish a retaliation claim, Plaintiff "must demonstrate that she engaged in protected activity, that she suffered an adverse action, and that there is a causal connection between the two." *Id*. at 243. Fortunately for Plaintiff, she may pursue a retaliation claim "regardless of whether the initial claims of discrimination are meritless." *Dickerson v. Bd. of Trs. of Cmty. Coll. Dist. No. 522*, 657 F.3d 595, 601 (7th Cir. 2011).

Because no one disputes that Thayer engaged in a protected activity when she requested accommodation nor is there any question she suffered a materially adverse action when she was terminated, the sole question remaining is whether her termination was causally linked with her request for accommodation. To show that retaliation was the "but for" reason for her termination, Plaintiff can use either direct or circumstantial evidence. *Monroe v. Indiana Dep't of Transp.*, 871

F.3d 495, 503 (7th Cir. 2017). An admission that LNL fired Plaintiff in retaliation for her requests for accommodations would be direct evidence. *Id*. Such evidence is, of course, rare. More often, plaintiffs present circumstantial evidence of discrimination. Such evidence includes: "(1) suspicious timing; (2) ambiguous statements or behavior towards other employees in the protected group; (3) evidence, statistical or otherwise, that similarly situated employees outside of the protected group systematically receive[d] better treatment; and (4) evidence that the employer offered a pretextual reason for an adverse employment action." *Id*. at 504. In reviewing the designated evidence, the Court must keep in mind the sole question that matters: "Whether a reasonable juror could conclude that [the plaintiff] would have kept [her] job if [s]he [did not have the proscribed factor], and everything else had remained the same." *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 764 (7th Cir. 2016).

Plaintiff has designated no evidence connecting her termination to her requests for accommodation. Her brief does little more than recite the same facts insufficient to show a failure to accommodate. These facts do nothing more when used in the retaliation context. Instead, the facts show that Plaintiff was terminated over her failure to so much as try LNL's proposed accommodation and her continued insistence that she be placed in another position. No reasonable jury could find that Plaintiff lost her job over ADA retaliation, mandating the entry of summary judgment.

### III.    Conclusion

For these reasons, Defendant's Motion for Summary Judgment (ECF No. 15) is GRANTED. Plaintiff's Motion to Amend (ECF No. 24) is DENIED. The Clerk is DIRECTED to enter judgment for Defendant and against Plaintiff.

SO ORDERED on January 10, 2022.

                                   s/ *Holly A. Brady*
                                   JUDGE HOLLY A. BRADY
                                   UNITED STATES DISTRICT COURT